**AMERICAN SOCIETY OF PENSION ACTUARIES, Plaintiff,**

v.

**INTERNAL REVENUE SERVICE, Defendant.**

**Civ. A. No. 90–0683 SS.**

United States District Court, District of Columbia.

Sept. 12, 1990.

David Levin, Feder & Associates, Washington, D.C., for plaintiff.

Kathryn J. Brown, Trial Atty., Tax Div., Justice Dept., Washington, D.C., for defendant.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This case involves a Freedom of Information Act ("FOIA") request for documents. The request, made by the American Society of Pension Actuaries ("ASPA"), sought to uncover the reasoning behind a revenue estimate contained in the President's Proposed Budget for Fiscal Year 1990. This matter is now before this Court on defendant's motion for summary judgment and plaintiff's opposition thereto, and following an *in camera* inspection by the Court of disputed documents. For the following reasons, defendant's motion is granted with respect both to documents pertaining to enforcement methods and to predecisional, deliberative documents. Certain of the documents inspected *in camera* by the Court, however, were neither predecisional nor enforcement-related. These documents formed the basis for the revenue estimate and were therefore embodied in the President's Budget. With respect to these documents, summary judgment is granted for the plaintiff.

*Background*

The President's Proposed Budget for Fiscal Year 1990 contained a provision estimating that "IRS Management Initiatives" could yield $2.6 billion in Fiscal Years 1990 and 1991. According to "General Explanations of the President's Budget Proposals Affecting Receipts," a document prepared by the Treasury Department, this revenue would come in part from more aggressive auditing of small retirement plans. The Treasury Department claimed that shifting examiners from other tasks to the examination of retirement plans would produce an additional $666 million in government receipts.

ASPA is a non-profit professional association representing actuarial examiners who administer approximately 30% of the qualified retirement plans in the United States. Following release of the President's Budget, ASPA asked the Internal Revenue Service ("IRS") to deliver any documents relating to the $666 million estimate. When the IRS failed to comply with this request in a timely fashion, ASPA initiated this suit.

Since the action was commenced, the IRS has produced some of the requested documents. Some documents were delivered with redactions, however, and others have been withheld entirely. The material still in dispute includes both documents pertaining to the IRS's planned implementation of its retirement-plan audit program as well as documents elaborating the basis on which the Administration made its $666 million estimate.

*Documents relating to enforcement methods*

Two of the documents already furnished to ASPA were delivered with redactions. In his affidavit, Edward J. Weiler, the IRS official who supervised the production of documents to ASPA, explained the redactions as follows:

> The portion of these documents that were deleted contain guidance to revenue agents. For example, some of the portions that contain criteria that should be used for examination case selection.

Weiler Affidavit at ¶ 5. ASPA does not dispute Mr. Weiler's assertions. Rather, it argues that Mr. Weiler's representations do not meet the legal standard for exemption from FOIA.

The IRS bases its decision to redact on FOIA Exemption 7:

> This section does not apply to ... records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ... would disclose techniques and procedures for law enforcement investigations and prosecutions, or would disclose guidelines for law enforcement investigations and prosecutions if such disclosure could reasonably be expected to risk circumvention of the law....

5 U.S.C. § 552(b)(7)(E). Material indicating the criteria IRS agents use to select returns for examination is certainly material the disclosure of which "could reasonably be expected to risk circumvention of the law." As ASPA well knows, IRS resources are limited. The agency cannot review every filed return. The government is forced to rely on the possibility of audit to ensure compliance. If taxpayers were able to gain access to the IRS's selection criteria, and to use this access to ensure for themselves a low risk of audit, the government's enforcement objectives could be impeded.

As Mr. Weiler's affidavit is uncontradicted by ASPA, there is no material fact at issue with respect to the redactions. This Court resolves the legal issue they present in favor of the defendant IRS, and therefore grants its motion for summary judgment with respect to this group of documents.

*Documents providing the basis for the Administration's revenue estimate*

ASPA also seeks production of documents explaining the basis for the Administration's claim that modifying IRS enforcement practices will yield an additional $666 million in revenue. The IRS claims that these documents are exempted from FOIA because they were generated in the course of deliberation within the executive branch. The IRS points to 5 U.S.C. 552(b)(5), also known as "Exemption 5" under FOIA: "This section does not apply to matters that are ... inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."

The Supreme Court in *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975), established that Exemption 5 includes "the Government's executive privilege." *Id.* at 150, 95 S.Ct. at 1560. The purpose of this exemption, according to the *Sears* Court, is "to prevent injury to the quality of agency decisions." Ensuring the confidentiality of executive branch deliberations promotes the " 'frank discussion of legal or policy matters' " that is a prerequisite for sound governmental decision-making. *Id.* (quoting S.Rep. No. 813 at 9).

To this end, Exemption 5 protects "predecisional communications." *Id.* at 151, 95 S.Ct. at 1516–17. *Sears* is clear, however, that protection from FOIA ends abruptly the moment a decision is made by the executive. "[C]ommunications made after the decision and designed to explain it" are reachable under FOIA. *Id.* Similarly, documents "which embody the agency's effective law and policy" are also subject to FOIA-mandated production. *Id.* at 153, 95 S.Ct. at 1517–18 (quoting Davis, The Information Act: A Preliminary Analysis, 34 U.Chi.L.Rev. 761, 797 (1967)).

The reasoning behind this sharp dichotomy between protected predecisional memoranda and unprotected post-decisional or decision-embodying memoranda is compel-

ling. The government interest in confidentiality of post-decisional memoranda is weak; "it is difficult to see how the quality of a decision will be affected by communications with respect to the decision occurring after the decision is finally reached." *Id.* at 151, 95 S.Ct. at 1517. At the same time, the public's interest in disclosure is strong; "the public is vitally concerned with the reasons which did supply the basis for an agency policy actually adopted. These reasons, if expressed within the agency, constitute the 'working law' of the agency and have been held by lower courts to be outside the protection of Exemption 5." *Id.* at 152–53, 95 S.Ct. at 1517. In contrast to predecisional memoranda, which may express positions that were eventually rejected or ignored by the executive decision-maker, documents that are the basis of an agency's decision or are created afterwards to explain the decision are acknowledged expressions of the agency's position.

To determine whether the documents sought by ASPA are predecisional, this Court ordered an *in camera* inspection of the twelve documents at issue. This inspection revealed that the documents fall into two categories. Documents 1, 2, 3, 4, 5, 6, 10, and 11 are the IRS's initial estimates of the potential revenue yield of the proposed shift in audit resources. These documents are clearly predecisional. The revenue estimates contained in these documents are not $666 million. The change between these early documents and the eventual estimate reflects the evolution of the IRS's estimating process; as intra-agency discussion progressed, the assumptions underlying the estimate changed and the estimate varied accordingly. These documents were part of the IRS's deliberative process and are therefore protected by Exemption 5. *See Bureau of National Affairs v. United States Department of Justice,* 742 F.2d 1484, 1496–98 (D.C.Cir. 1984) (budget proposals prepared by EPA but rejected by OMB are predecisional).

■ The remaining documents, numbered 7, 8, 9, and 12, contain the assumptions and calculations that yield the $666 million estimate. Like the other documents, these memoranda were part of the IRS's deliberative process. Unlike the other documents, however, the estimate they produced became part of the President's Budget. By estimating that the IRS could generate $666 million in revenue by shifting its enforcement practices, the government adopted as its official policy the calculations and assumptions underlying this estimate. *See Coastal States Gas Corp. v. Department of Energy,* 617 F.2d 854, 866 (D.C.Cir.1980) ("even if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue"). Because Documents 7, 8, 9, and 12 contain the analytic backup for the government estimate, they "embody the agency's effective law and policy" and therefore are not protected by Exemption 5.

The IRS argues that exposure of decision-embodying memoranda to FOIA production is limited by *Sears* to situations in which "an agency chooses *expressly* to adopt or incorporate by reference an intra-agency memorandum ... [in] a final opinion." *Sears,* 421 U.S. at 161, 95 S.Ct. at 1521–22 (emphasis in original). But the IRS places too much weight on the word "expressly." The *Sears* requirement of express adoption is designed to ensure that FOIA reaches only documents expressing the views actually relied upon by the government in making policy. The documents at issue in *Sears* were NLRB memoranda prepared in the course of deciding whether to proceed with unfair labor practice complaints. A decision like that might be motivated by myriad considerations; the simple fact that an intra-agency deliberative memorandum reaches the same conclusion as the ultimate decision-maker provides no guarantee that the memorandum represents the views actually adopted by the government. In most cases, then, permitting FOIA to reach all documents expressing the bottom-line conclusion eventually espoused by the government would intrude severely into the deliberative process exemption.

But when, as in this case, the government states a budget estimate with numerical specificity, the public is entitled to presume that a particular set of calculations and assumptions underlie the estimate. The risk that exposing this analytic backup would misrepresent the reasoning actually motivating the government decision-maker is minimal.

Having examined *in camera* the documents submitted by the IRS numbered 7, 8, 9, and 12, it is clear to this Court that they were the documents relied upon by the government in making its $666 million estimate. This Court further finds that, by including this estimate in the Treasury Department's published explanation of the President's Budget, the government expressly adopted the computations used to produce the $666 million figure. Defendant's motion for summary judgment as to documents 7, 8, 9, and 12 is accordingly denied. Further, this Court notes that no material issue of fact remains to be decided with respect to ASPA's claim for production of these documents. It is therefore appropriate for this Court to enter summary judgment in favor of the plaintiff with respect to documents 7, 8, 9, and 12, plaintiff's failure to move for summary judgment notwithstanding. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 ("district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence"); C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2720 (1983) ("the weight of authority is that summary judgment may be rendered in favor of the opposing party even though he or she has made no formal cross-motion under rule 56"). With respect to all other documents at issue, the defendant's motion for summary judgment is granted.